SPRING MOTORS DISTRIBUTORS, INC., A CORPORATION, PLAINTIFF-RESPONDENT, v. FORD MOTOR COMPANY; CLARK EQUIPMENT COMPANY, A CORPORATION AND TURNPIKE FORD TRUCK SALES, INC., A CORPORATION, DEFENDANTS-APPELLANTS.

Argued April 30, 1984—Decided March 28, 1985.

J. *Michael Nolan, Jr.,* argued the cause for appellants Ford Motor Company and Turnpike Ford Truck Sales, Inc., etc. (*Pitney, Hardin, Kipp & Szuch,* attorneys; *J. Michael Nolan, Gail H. Allyn* and *Stephen V. Gimigliano,* on the briefs).

*Richard S. Zackin* argued the cause for appellant Clark Equipment Company, etc. (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Richard S. Zackin* and *John H. Klock,* on the briefs).

*Ronald Silber* argued the cause for respondent (*Krevsky & Silber,* attorneys; *Ronald Silber* and *Marianne Caulfield,* on the briefs).

*Cynthia J. Jahn,* Assistant Counsel, submitted a brief on behalf of *amicus curiae* New Jersey School Boards Association (*Paula A. Mullaly,* General Counsel, attorney).

*Robert C. Billmeier* submitted a brief on behalf of *amicus curiae* United States Gypsum Company (*Backes, Waldron & Hill,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The fundamental issue on this appeal concerns the rights of a commercial buyer to recover for economic loss caused by the purchase of defective goods. More specifically, the question is whether the buyer should be restricted to its cause of action under the Uniform Commercial Code (hereinafter U.C.C. or the Code) or should be allowed to pursue a cause of action predicated on principles of negligence and strict liability. The difference is important because the buyer in the present case instituted its action beyond the four-year period provided by the U.C.C., *N.J.S.A.* 12A:2–725, but within the six-year period applicable to tort actions, *N.J.S.A.* 2A:14–1.

The defendants are a motor vehicle manufacturer, its dealer, and a supplier of transmissions. The gravamen of the complaint is that defects in the transmissions, which were installed in commercial trucks, caused the buyer to sustain a loss in the benefit of its bargain and consequential damages. Specifically, the buyer sought recovery for repair, towing, and replacement parts, as well as for lost profits and a decrease in the value of the trucks.

The trial court perceived the matter as sounding in contract and found that the plaintiff had not instituted its action within the four-year period provided by the U.C.C. *N.J.S.A.* 12A:2–725. In an unreported decision, the court granted summary judgment for defendants. The Appellate Division reversed on the ground that the action was more appropriately characterized as one in strict liability in tort, not contract, and that the six-year period of limitations applicable for tort actions had not expired. 191 *N.J.Super.* 22 (1983). We granted defendants' petition for certification. 95 *N.J.* 208 (1983).

We hold that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., but not in strict liability or negligence. We hold also that the buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties. Accordingly, the four-year period of limitations provided by the Code, *N.J.S.A.* 12A:2–725, not the six year general statute of limitations, *N.J.S.A.* 2A:14–1, determines the time within which an action must be commenced against the immediate seller and remote supplier.

I

Because this matter is presented on defendants' motion for summary judgment, we accept as true plaintiff's version of the facts, according that version the benefit of all favorable infer-

ences. *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 61 (1980). Plaintiff, Spring Motors Distributors, Inc. (Spring Motors), which is in the business of selling and leasing trucks, operates a fleet of 300 vehicles. Spring Motors agreed to purchase from defendant Turnpike Ford Truck Sales, Inc. (Turnpike) 14 model LN8000 trucks made by defendant Ford Motor Company (Ford) at a purchase price of $265,029.80. Turnpike is a Ford dealer, and throughout these proceedings the two defendants have been treated as a single entity.

In the agreement, Spring Motors specified that the trucks should be equipped with model 390V transmissions made by Clark Equipment Company (Clark), a supplier to Ford. Spring Motors specified Clark transmissions because of "excellent service and parts availability on past models" and because of Clark's advertisements and brochures.

At the time of the sale to Spring Motors, Ford issued a form warranty with each truck to

repair or replace any of the following parts that are found to be defective in factory material or workmanship under normal use in the United States or Canada on the following basis: * * * any part during the first 12 months or 12,000 miles of operation, whichever is earlier * * * transmission case and all internal transmission parts (including auxiliary transmission) * * * after 12,000 miles and during the first 12 months or 50,000 miles of operation, whichever is earlier, for a charge of 50% of the dealer's regular warranty charge to Ford for parts and labor. * * * For series 850 and higher trucks, any part of the * * * transmission * * * for the first 12 months or 100,000 miles of operation, whichever is earlier * * *.

The warranty also stated: "To the extent allowed by law, this WARRANTY IS IN PLACE OF all other warranties, express or implied, including ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS." Furthermore, the Ford warranty expressly stated: "Under this warranty, repair or replacement of parts is the only remedy, and loss of use of the vehicle, loss of time, inconvenience, commercial loss or consequential damages are not covered."

The warranty that Clark extended to Ford provided: "WARRANTY. Clark Equipment Company ('Clark') warrants to Buy-

er that each new Clark axle, transmission, torque converter and drive train product, and components thereof, shall be free from defects in material and workmanship under normal use and maintenance" for 12 months or 12,000 miles for on-highway vehicles used on highways or 2,000 miles for off-highway equipment. At Clark's option, the warranty could be limited to repairs or replacements. The warranty also stated: "THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES (EXCEPT OF TITLE), EXPRESSED OR IMPLIED, AND THERE IS NO IMPLIED WARRANTY OF MERCHANTABIL-ITY OR OF FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL CLARK BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES."

Spring Motors took delivery of the trucks in November 1976, and leased them to Economic Laboratories, Inc. (Economic), which used the trucks in cities and on highways for their intended purpose of hauling. Spring Motors, which serviced the trucks during the period of the lease, began experiencing problems with the performance of the Clark transmissions as early as February 1977. The problems persisted, and Spring Motors communicated directly with Clark, writing in October 1977 that it had "had nothing but trouble" with the transmissions. Later correspondence, dated January 26, 1978, confirmed that Clark analyzed the transmissions and found that "the failure in these gear boxes was a result of improper angle degree in the way certain gears were cut," resulting "in additional strain on the actual gear and the mating gear and related shafts." Still later, Spring Motors pointed out that the transmission failures had cost it "several thousand dollars in out of pocket expenses plus many additional thousands of dollars in lost revenues, customer ill will, replacement equipment, etc."

Clark provided Spring Motors with replacement parts, but the transmission failures continued. On July 11, 1978, Spring Motors wrote to Clark that in the absence of a satisfactory response by August 1, it would remove and replace the Clark transmissions and "take whatever action is necessary to hold

you financially responsible." Thereafter, on November 1, 1979, Spring Motors and Economic terminated the truck lease and, as part of a settlement, Economic purchased the trucks for $247,-580.97. Four years and one month after the delivery of the trucks, on December 23, 1980, Spring Motors instituted this action.

In the complaint, which contained three counts, Spring Motors sought judgment against all defendants for consequential damages: the expenses of towing, repairs, and replacement of parts; lost profits; and decrease in market value of the trucks. The first count asserted that the defendants breached certain express and implied warranties; the second count claimed a violation of the Magnuson-Moss Act, 15 *U.S.C.* §§ 2301 to –2312, a claim that Spring Motors no longer pursues; and the third count sought recovery in strict liability and negligence.

The trial court found that a lack of privity barred the action between Spring Motors and Clark and that the four-year period of limitations under the U.C.C., *N.J.S.A.* 12A:2–725, barred any action against Ford and Turnpike. The Court further found the six-year statute of limitations, *N.J.S.A.* 2A:14–1, pertaining to tort actions for property damage, inapplicable. Consequently, the trial court dismissed the complaint as to all defendants.

The Appellate Division affirmed the dismissal of the breach of warranty claim in the first count, but reversed the dismissal of the tort claims, without discussing the negligence aspect of the third count. That court concluded that Spring Motors, as a commercial buyer, could maintain its strict liability claim against all defendants. 191 *N.J.Super.* at 41. The court also determined that the six-year limitation period provided by *N.J. S.A.* 2A:14–1 applied and that plaintiff's action was, therefore, timely. *Id.* at 44.

We granted petitions for certification by Ford, Turnpike, and Clark to review that part of the Appellate Division judgment that reversed the dismissal of the tort claims. Spring Motors

did not file a cross-petition seeking review of the dismissal of the warranty claims, and that issue is not before us.

II

If the legal relationships among the parties are governed by the U.C.C., then plaintiff's action, which was instituted more than four years after the delivery of the trucks, is time-barred. Hence, one question is whether the Code provides the exclusive remedies available to Spring Motors. In answering that question, we turn to the structure and purpose of the Code, which constitutes a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods. *Ramirez v. Autosport,* 88 *N.J.* 277, 285–90 (1982). Its underlying purpose is to clarify and make uniform throughout the United States the law governing commercial transactions. *N.J.S.A.* 12A:1–102.

The Code provides for express warranties regarding the quality of goods, *N.J.S.A.* 12A:2–313, as well as implied warranties of merchantability, *N.J.S.A.* 12A:2–314, and of fitness for a particular purpose, *N.J.S.A.* 12A:2–315. As is subsequently discussed in greater detail, a seller's warranty, whether express or implied, extends to members of the buyer's family or his household guests, who are viewed as third-party beneficiaries, and a seller may not exclude or limit the extension of those warranties to such persons. *N.J.S.A.* 12A:2–318.

Subject to requirements of good faith, diligence, and reasonableness, parties may vary the terms of the Code. *N.J.S.A.* 12A:1–102. A seller may exclude or modify its liability on warranties, and if in writing, the exclusion or modification must be "conspicuous." *N.J.S.A.* 12A:2–316. Furthermore, a buyer and seller may agree to limit the buyer's remedy to the repair and replacement of parts. *N.J.S.A.* 12A:2–719(1)(a). Similarly, the parties may agree to limit or exclude consequential damages, "unless the limitation or exclusion is unconscionable." *N.J.S.A.* 12A:2–719(3). Although a limitation of consequential

damages for personal injuries in the case of consumer goods is *prima facie* unconscionable, a limitation of damages for a commercial loss is not. *Id.*

When a seller delivers goods that are not as warranted, the buyer's measure of damage is the difference between the value of the defective goods and the value they would have had if they had been as warranted. *N.J.S.A.* 12A:2–714. In a proper case, a buyer may also recover incidental damages, which include reasonable expenses incidental to the breach, *N.J.S.A.* 12A:2–715; consequential damages, including losses resulting from the buyer's particular needs of which the seller had knowledge, *id.* at (2)(a); and property damage, *id.* at (2)(b).

Economic loss can take the form of either direct or consequential damages. A direct economic loss includes the loss of the benefit of the bargain, *i.e.*, the difference between the value of the product as represented and its value in its defective condition. Consequential economic loss includes such indirect losses as lost profits. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* §§ 11–4 to 11–6 at 405–10 (2d ed. 1980) [hereinafter cited as White & Summers]; Note, "Economic Loss in Products Liability Jurisprudence," 66 *Colum.L.Rev.* 917, 918 (1966); Note, "Manufacturer's Liability to Remote Purchasers for 'Economic Loss' Damages—Tort or Contract?," 114 *U.Pa.L.Rev.* 539, 542 (1966). Because it presents a claim for economic loss, which is not normally recoverable in a tort action, rather than a claim for physical harm, this case probes the boundary between strict liability and the U.C.C. The delineation of that boundary requires a brief summary of the history and nature of strict liability.

One year before the adoption of the U.C.C. in New Jersey, this Court delivered its landmark opinion in *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358 (1960). *Henningsen* involved a defective automobile that crashed and caused property damage to the car and personal injuries to the driver, who

was the owner's wife. The Court affirmed a judgment in favor of the plaintiffs on the theory of breach of implied warranty of fitness. Justice Francis wrote in now familiar language: "[U]nder modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser." 32 *N.J.* at 384. By extending a warranty of safety to consumers of all products, not just those intended for human consumption, *Henningsen* removed the notion of privity of contract from all cases involving the sale of defective goods that cause physical injury.

Prosser describes the effect of the *Henningsen* holding as "the most rapid and altogether spectacular overturn of an established rule in the entire history of the law of torts." W. Prosser & W. Page Keeton, *Handbook of the Law of Torts* § 97 at 690 (5th ed. 1984) [hereinafter cited as Prosser & Keeton]. Courts throughout the country followed the lead of New Jersey, *id.*, and the American Law Institute (ALI) included a new section, 402A, captioned "Special Liability of Seller of Product for Physical Harm to User or Consumer," in the *Restatement (Second) of Torts.* The comment to section 402A disavows that the section is governed by the warranty provisions of the U.C.C. or by U.C.C. limitations on the scope and content of the warranties.

Underlying the *Henningsen* decision was the Court's recognition that consumers were in an unequal bargaining position with respect to automobile manufacturers and dealers, who required them to sign standard contracts. *Henningsen, supra,* 32 *N.J.* at 389–404. One of the main purposes of strict liability, as declared in *Henningsen,* is the allocation of the risk and distribution of the loss to the better risk-bearer. *Id.* at 379; *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 173 (1979). Generally, the manufacturer, who is better able to eliminate defects from its product and who can spread the cost of the risk among all of its customers, is the better risk-bearer.

*Restatement, supra,* § 402A comment c. By contrast, the individual consumer is poorly situated to bear the entire risk of loss from injuries caused by a defective product. Through allocation of the risk of loss to the manufacturer, strict liability achieves its objective of protecting the consumer who, because of unequal bargaining power, cannot protect him or herself.

The year after the *Henningsen* decision, 1961, the Legislature adopted the U.C.C., effective January 1, 1963. *L.*1961, *c.* 120. Then in 1965 this Court decided *Santor v. A. & M. Karagheusian, Inc.,* 44 *N.J.* 52, which, like *Henningsen,* involved facts that occurred before the adoption of the U.C.C. In *Santor,* a carpet manufacturer sold a defective carpet to a consumer through its wholly-owned distributor. The Court found that the consumer could recover against the manufacturer, although there was no privity between the parties and the action was for an economic loss.

The action was couched in terms of a breach of implied warranty of merchantability, *id.* at 63, but the Court acknowledged that the action could be described better as one in strict liability. *Id.* at 63–67. In *Santor,* Justice Francis made clear that neither mass advertising by the manufacturer nor personal injuries to the consumer was essential to the invocation of strict liability. *Id.* at 65. Echoing his words in *Henningsen,* he stated that the purpose of a strict liability action was to shift the risk of loss so that it was borne by "the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves." *Id.* Like the plaintiff in *Henningsen,* the plaintiff in *Santor* was an individual consumer. Furthermore, the action was for a direct economic loss, and the Court limited recovery to the lost benefit of the bargain, *i.e.,* "the difference between the price paid by the plaintiff and the actual market value of the defective carpeting at the time when plaintiff knew or should have known it was defective * * *." *Id.* at 68–69.

In two later cases, *Rosenau v. City of New Brunswick & Worthington Gamon Meter Co.*, 51 *N.J.* 130, 143 (1968), and *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 149–50 (1973), the Court stated that strict liability, not the U.C.C., should apply to an action for damages between a consumer and a manufacturer who were not in privity. *Rosenau* involved a suit by homeowners against the manufacturer of water meters sold to a municipality for its water system. One of the meters broke, causing property damage to plaintiffs' home, and plaintiffs sued in strict liability and negligence within six years of the date of the damage, but more than twenty years after the sale of the meters to the municipality. After finding that the tort action did not accrue until the damage occurred, the Court found applicable the six-year period provided by the general statute of limitations for property damage, *N.J.S.A.* 2A:14–1. Justice Jacobs noted that the plaintiffs' action was not "for economic loss or loss of bargain; their claim is for physical harm to their property * * *." *Rosenau, supra,* 51 *N.J.* at 142. He then concluded that the U.C.C. "explicitly relates to actions 'for breach of any contract for sale' and presumably was not intended to apply to actions between consumers and manufacturers who were never in any commercial relationship or setting." *Id.* at 143.

*Heavner* concerned an action against a manufacturer for damages to a truck and personal injuries to its driver caused by a tire blowout. The action was instituted more than three years after the accident. This Court ruled that the two-year statute of limitations applicable to personal injury actions in tort, *N.J.S.A.* 2A:14–2, not the four-year period provided by the U.C.C., *N.J.S.A.* 12A:2–725, applied to the personal injury action and the wife's claim for loss of consortium. *Heavner, supra,* 63 *N.J.* at 156–57. In affirming a judgment dismissing the personal injury count, Justice Hall wrote that "*N.J.S.A.* 12A:2–725 does not apply to strict liability in tort actions for consequential personal injury and property damage against the ultimate seller or supplier and that such actions are governed, like

those against a manufacturer, by our general statutes of limitation." *Id.* at 157. He carefully noted, however, that "[w]e do not reach the question whether *N.J.S.A.* 12A:2–725 applies to actions merely for loss-of-the-bargain or economic damage in a commercial sense." *Id.* at 157 n. 16. Neither *Rosenau* nor *Heavner* involved a claim for economic loss, and neither case involved an action between commercial parties.

As the preceding cases demonstrate, the U.C.C. rules pertaining to the sale of goods overlap the doctrine of strict liability for placing a defective product in the stream of commerce. One reason for the overlap is that strict liability, in this regard, evolved from implied warranties of fitness and merchantability under the U.C.C. and its predecessor, the Uniform Sales Act. Those warranties originated as a matter of social policy to compensate consumers who sustained personal injuries from defective food. Prosser & Keeton, *supra*, § 97 at 690. Neither the ALI, which published the *Restatement (Second) of Torts*, nor the permanent editorial board of the U.C.C., which operates as a joint project of the ALI and the Commissioners on Uniform State Laws, has undertaken to resolve the overlap between strict liability as declared in section 402A and the breach of warranty provisions under the U.C.C. 112 *N.J.L.J.* 700 (1983).

From the perspective of the injured party, strict liability generally provides a more congenial environment than contract principles, which may prevent recovery because of a lack of privity with the manufacturer. In addition to privity, the Code retains two other requirements that may pose considerable obstacles to a buyer. The first requirement is that of notice to a seller of a breach of warranty, *N.J.S.A.* 12A:2–607(3); the second arises from the seller's ability to limit or disclaim liability to an innocent purchaser. *N.J.S.A.* 12A:2–316. A buyer who does not deal directly with a manufacturer cannot negotiate over the terms of a disclaimer and might find it impossible to give the manufacturer notice of the breach of warranty following an injury. Prosser & Keeton, *supra*, § 97

at 691–92. Strict liability, on the other hand, circumvents the technical requirements of the U.C.C. with respect to privity, notice, and limitation of damages. Avoiding those requirements is particularly important for persons outside the distributive chain who sustain physical damage caused by a defective product.

■■ By comparison, the U.C.C. emphasizes the simplification of the law governing commercial transactions and the expansion of commercial practices through agreement. *N.J. S.A.* 12A:1–102. Underlying the U.C.C. policy is the principle that parties should be free to make contracts of their choice, including contracts disclaiming liability for breach of warranty. Once they reach such an agreement, society has an interest in seeing that the agreement is fulfilled. Consequently, the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain.

The problem is ascertaining where on the spectrum to place a cause of action brought by a commercial entity, or even a consumer, for purely economic loss. One gains perspective by reviewing the decisions of this Court and those of the Supreme Court of California.

As explained earlier, this Court's decision in *Henningsen* was couched in warranty terms. In *Greenman v. Yuba Power Prods., Inc.,* 59 *Cal.*2d 57, 27 *Cal.Rptr.* 697, 701, 377 *P.*2d 897, 901 (1962), which involved personal injuries sustained by a husband from a defective power saw purchased by his wife, the California court drew on *Henningsen,* but declared that the cause of action could be more appropriately denominated as strict liability in tort.

The cross-pollination between the two jurisdictions continued through our *Santor* decision, which relied on *Greenman.* Five months later, however, when the California court was confronted with an individual's claim for economic loss resulting from the purchase of a defective truck, that court rejected *Santor*

and held that the consumer could not recover in strict liability for economic loss. *Seely v. White Motor Co.*, 63 *Cal.*2d 9, 45 *Cal.Rptr.* 17, 403 *P.*2d 145 (1965).

In *Seely*, an individual owner-driver purchased a truck for use in his heavy duty hauling business. From the time the purchaser took possession, the truck bounced violently, but the dealer was unable to correct the defect. Thereafter, a brake failure caused the truck to overturn. The truck sustained property damage, and Seely, who stopped making payments after the accident, sued the dealer and the manufacturer for lost profits and the money paid on the purchase price of the truck.

Chief Justice Traynor, writing for the majority of the court, affirmed a judgment for Seely. The absence of privity did not preclude judgment against the manufacturer for the breach of an express warranty that the truck was "free from defects in material and workmanship under normal use and service * * *." *Seely, supra,* 63 *Cal.*2d at 13, 45 *Cal.Rptr.* at 20, 403 *P.*2d at 148. After reaching that result, the court rejected plaintiff's alternative contention of strict liability. The court ruled that in the absence of personal injuries or property damage strict liability was inapplicable. Although the truck had been damaged, the court sustained a finding of the trial court that defendant had not created the defect that caused the damage.

While rejecting plaintiff's right to recover in strict liability, Chief Justice Traynor observed that the law of sales has been carefully articulated to govern economic relationships between suppliers and consumers. He stated further that strict liability was not intended to undermine the warranty provisions of the U.C.C., but "to govern the distinct problem of physical injuries." *Seely, supra,* 63 *Cal.*2d at 15, 45 *Cal.Rptr.* at 21, 403 *P.* 2d at 149.

In a concurring and dissenting opinion, Justice Peters embraced *Santor,* and stated that an individual consumer should be allowed to recover in strict liability for economic damages

such as those sustained by Seely. *Seely, supra,* 63 *Cal.*2d at 20–22, 45 *Cal.Rptr.* at 25–27, 403 *P.*2d at 153–55. According to Justice Peters, the roles played by the parties and the nature of the transaction, not the nature of the damage, were important. *Id.* He also distinguished transactions involving consumers from those *"within* the world of commerce, where parties generally bargain on a somewhat equal plane and may be presumed to be familiar with the legal problems involved when defective goods are purchased." *Seely, supra,* 63 *Cal.*2d at 27, 45 *Cal.Rptr.* at 29, 403 *P.*2d at 157 (emphasis in original).

Over the intervening years, *Seely* has emerged as representing the majority view. See, e.g., *Purvis v. Consolidated Energy Prods. Co.,* 674 *F.*2d 217, 222–23 (4th Cir.1982) (losses resulting from ineffectiveness of tobacco-curing equipment recoverable under the law of contracts rather than strict liability); *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 *F.*2d 280, 285–90 (3d Cir.1980) (strict liability does not apply in a suit for economic loss occasioned by defects in factory roof); *Iowa Elec. Light & Power Co. v. Allis-Chalmers Mfg. Co.,* 360 *F.Supp.* 25, 32 (S.D.Iowa 1973) (strict liability not available when the transaction was covered by contract negotiated between parties of equal bargaining power); *Morrow v. New Moon Homes, Inc.,* 548 *P.*2d 279, 283–86 (Alaska 1976) (the U.C.C., not strict liability, applies to a suit for defects in mobile home); *Arrow Leasing Corp. v. Cummins Ariz. Diesel, Inc.,* 136 *Ariz.* 444, 666 *P.*2d 544, 548 (1983) (products liability law was not designed to address economic losses caused by defective part in engine); *Hiigel v. General Motors Corp.,* 190 *Colo.* 57, 544 *P.*2d 983, 989 (1975) (business losses not recoverable under strict liability); *Chrysler Corp. v. Taylor,* 141 *Ga.App.* 671, 234 *S.E.*2d 123, 124 (1977) (automobile purchaser must sue under warranty law, not strict liability or negligence, for loss of the benefit of the bargain); *Moorman Mfg. Co. v. National Tank Co.,* 91 *Ill.*2d 69, 61 *Ill.Dec.* 746, 435 *N.E.*2d 443, 447 (1982) (adopting strict liability for economic loss ensuing from defects in grain storage tank would eviscerate sections of

U.C.C.); *Price v. Gatlin*, 241 *Or.* 315, 405 *P.*2d 502, 503 (1965) (without privity, buyer of personal property cannot recover economic loss); *Nobility Homes of Texas, Inc. v. Shivers*, 557 *S.W.*2d 77, 79 (Tex.1977) (strict liability inapplicable to action by purchaser of mobile home to recover economic losses); *cf. Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 *Kan.* 742, 675 *P.*2d 887, 898–99 (1984) (without privity, warranty of fitness does not extend to purchaser for economic loss caused by malfunctioning computer).

*Santor*, however, has attracted the support of a few jurisdictions. See *Mead Corp. v. Allendale Mut. Ins. Co.*, 465 *F.Supp.* 355, 363–66 (N.D.Ohio 1979) (commercial buyer allowed to recover under strict liability in tort for direct and indirect economic losses due to defective steam turbine); *Cova v. Harley Davidson Motor Co.*, 26 *Mich.App.* 602, 182 *N.W.*2d 800, 804 (1970) (owners of golf course may recover against manufacturer in strict liability for economic losses resulting from defects in golf carts); *Iacono v. Anderson Concrete Corp.*, 42 *Ohio St.*2d 88, 326 *N.E.*2d 267, 269–71 (1975) (homeowner permitted to maintain an action in tort for damage to concrete driveway due to defective materials and workmanship); *City of LaCrosse v. Schubert*, 72 *Wis.*2d 38, 240 *N.W.*2d 124, 127 (1976) (manufacturer of defective roofing materials may be liable for loss of value of roof under strict liability in tort, and, in *dicta*, consequential economic damages are also recoverable).

Commentators likewise have been critical of *Santor*, and wary of extending strict liability to encompass claims for purely economic loss. *See, e.g.*, White & Summers, *supra*, § 11–9 at 418 (in claims for economic loss, better solution than in *Santor* would be to hold strict liability inapplicable and apply statute of limitations under the Code); Franklin, "When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases," 18 *Stan.L.Rev.* 974, 989–90 (1966) (criticizing courts as defiant or unaware of relevance of sales law to products liability law); Speidel, "Products Liability, Economic Loss and the U.C.C.," 40 *Tenn.L.Rev.* 309, 316–18, 327 (1973) (social needs justify strict

liability where product is so dangerous that personal injury or property damage may occur, but case is less compelling where other commercial losses occur; U.C.C. is ideally suited for resolution of commercial loss claims); Wade, "Tort Liability for Products Causing Physical Injury and Article 2 of the U.C.C.," 48 *Mo.L.Rev.* 1, 26 n. 87 (1983) (substantial majority rule, in accord with *Seely*, is that economic loss is not actionable in tort); Note, "Economic Loss in Products Liability Jurisprudence," *supra*, 66 *Colum.L.Rev.* at 961, 965 (under U.C.C., seller may limit liability for economic damages to a consumer; contractual risk-spreading should control); Note, "Manufacturers' Liability to Remote Purchasers for 'Economic Loss' Damages—Tort or Contract?," *supra*, 114 *U.Pa.L.Rev.* at 548–49 (U.C.C. standards seem more appropriate than products liability law when damage is loss of buyer's bargain); Comment, "The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy," 4 *Seton Hall L.Rev.* 145, 175 (1972) (Legislature intended that U.C.C. control the recovery for direct economic loss); *cf.* Rapson, "Products Liability Under Parallel Doctrines: Contrasts Between the Uniform Commercial Code and Strict Liability in Tort," 19 *Rutgers L.Rev.* 692, 712 (1965) (creation of common-law products liability doctrine, bypassing the U.C.C., creates jurisprudential question).

In the present case, which involves an action between commercial parties, we need not reconsider the *Santor* rule that an ultimate consumer may recover in strict liability for direct economic loss. To determine whether a commercial buyer may recover economic loss, however, we must reconsider the policies underlying the doctrine of strict liability and those underlying the U.C.C. Those policy considerations include, among others, the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system. As a general rule, the rights and duties of a buyer and seller are determined by the law of sales, which throughout this century has been expressed first in the Uniform Sales Act and

more recently in the U.C.C. As indicated, however, strict liability evolved as a judicial response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods made or distributed by remote parties in the marketing chain.

The considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power. *Iowa Elec. Light & Power Co. v. Allis-Chalmers Mfg. Co., supra,* 360 *F.Supp.* at 32 (stating doctrine of strict liability loses all meaning when plaintiff is a large company suing for commercial loss). Furthermore, perfect parity is not necessary to a determination that parties have substantially equal bargaining positions. *Cf. Moreira Constr. Co., Inc. v. Moretrench Corp.,* 97 *N.J.Super.* 391, 394–95 (App.Div.1967), *aff'd o.b.,* 51 *N.J.* 405 (1968) (refusing to apply rule of *Santor* to suit between corporations even though plaintiff was a small company and defendant was the world's largest well point company). Suffice it to state that Spring Motors had sufficient bargaining power to persuade Ford to install Clark transmissions in the trucks that were the subject of the contract.

Insofar as risk allocation and distribution are concerned, Spring Motors is at least as well situated as the defendants to assess the impact of economic loss. Indeed, a commercial buyer, such as Spring Motors, may be better situated than the manufacturer to factor into its price the risk of economic loss caused by the purchase of a defective product. *See* Note, "Economic Loss in Products Liability Jurisprudence," *supra,* 66 *Colum.L.Rev.* at 952–58.

Presumably the price paid by Spring Motors for the trucks reflected the fact that Ford was liable for repair or replacement of parts only. By seeking to impose the risk of loss on Ford, Spring Motors seeks, in effect, to obtain a better bargain than it made. In such a context, the imposition of the risk of loss on the manufacturer might lead to price increases for all of its customers, including individual consumers. *Id.* at

956–57. As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement.

 Delineation of the boundary between strict liability and the U.C.C. requires appreciation not only of the policy considerations underlying both sets of principles, but also of the role of the Legislature as a coordinate branch of government. By enacting the U.C.C., the Legislature adopted a carefully-conceived system of rights and remedies to govern commercial transactions. Allowing Spring Motors to recover from Ford under tort principles would dislocate major provisions of the Code. For example, application of tort principles would obviate the statutory requirement that a buyer give notice of a breach of warranty, *N.J.S.A.* 12A:2–607, and would deprive the seller of the ability to exclude or limit its liability, *N.J.S.A.* 12A:2–316. In sum, the U.C.C. represents a comprehensive statutory scheme that satisfies the needs of the world of commerce, and courts should pause before extending judicial doctrines that might dislocate the legislative structure.

By allowing this case to proceed under strict liability principles, the Appellate Division erred in several respects. First, it relied too heavily on *Santor*, which did not consider the effect of the U.C.C. on a commercial transaction.

 Second, the court misread our decision last year in *H. Rosenblum, Inc. v. Adler*, 93 *N.J.* 324 (1983), which involved the liability of a public accountant for the negligent auditing of financial statements. Underlying the *Rosenblum* decision was our recognition that a public accountant's duty of care extended beyond the audited corporation to potential investors. The decision turned on the principle of negligent misrepresentation, not on strict liability. *Id.* at 334–35. Consequently, the case did not implicate the policy considerations that underlie strict liability, such as imposing on a manufacturer liability for physical harm caused by defective goods. Insofar as a commercial

buyer is concerned, strict liability is not an appropriate basis of a claim for economic loss. The policy considerations underlying both strict liability and the U.C.C. favor restricting a commercial buyer to an action for breach of warranty when seeking economic damages.

Plaintiff also misplaces its reliance on *Monsanto Co. v. Alden Leeds, Inc.*, 130 *N.J.Super.* 245 (Law Div.1974), to support the availability of tort theories for recovery of purely economic loss in a commercial setting. In *Monsanto*, a corporate plaintiff sued the seller of allegedly defective chemicals for damages resulting from a fire caused by the chemicals, which had been sold to a related corporation and stored in the plaintiff's building. *Id.* at 249. One of the issues was whether strict liability in tort would apply to a commercial plaintiff in a suit for property damage and consequential economic loss. *Id.* at 250, 256. *Monsanto* is distinguishable because it involved property damage, which is recoverable under strict liability. The case of *ICI Australia Ltd. v. Elliott Overseas Co.,* 551 *F.Supp.* 265 (D.N.J.1982), on which plaintiff likewise relies, also involved negligence and strict liability claims by a commercial buyer against an immediate seller for property damage caused by an accident. *Id.* at 268–69. *ICI Australia Ltd.* is distinguishable because it involved both an accident and property damage, neither of which is present in the instant case. Also distinguishable are cases involving claims for actual or potential personal injuries, claims that Spring Motors does not assert. See *Kodiak Electric Ass'n v. DeLaval Turbine, Inc.*, 694 P.2d 150, 153–54 (Alaska 1984) (denying summary judgment seeking dismissal of strict liability claim arising out of failure of electrical generator where there was "serious danger to persons.").

[12] For the preceding reasons, we hold that a commercial buyer seeking damages for economic loss only should proceed under the U.C.C. against parties in the chain of distribution. Hence, we reverse that part of the judgment of the Appellate

Division that permitted Spring Motors to maintain against the defendants an action in strict liability for economic loss.

## III

What we have said about Spring Motors' strict liability claim applies substantially to its negligence claim. Underlying that conclusion is the principle that a seller's duty of care generally stops short of creating a right in a commercial buyer to recover a purely economic loss. Thus viewed, the definition of the seller's duty reflects a policy choice that economic losses inflicted by a seller of goods are better resolved under principles of contract law. In that context, economic interests traditionally have not been entitled to protection against mere negligence. *See, e.g., Wyatt v. Cadillac Motor Car Div.*, 145 *Cal.App.*2d 423, 302 *P.*2d 665, 667 (1956) (no recovery in negligence against manufacturer for loss of value of automobile); *Trans World Airlines, Inc. v. Curtiss-Wright Corp.*, 1 *Misc.*2d 477, 148 *N.Y.S.*2d 284, 290 (Sup.Ct.1955) (absent an accident, airplane purchaser may not recover in negligence against manufacturer for repair costs of malfunctioning engines); *Inglis v. American Motors Corp.*, 3 *Ohio St.* 2d 132, 209 *N.E.*2d 583, 588 (1965) (purchaser of automobile could not recover in negligence from manufacturer for difference between purchase price and market value); Prosser & Keeton, *supra*, § 92 at 657; § 101 at 708 (recovery of intangible economic loss is normally determined by contract law).

The demarcation of duties arising in tort and those arising in contract is often indistinct, but one difference appears in the interest protected under each set of principles. Prosser & Keeton, *supra*, § 92 at 655–56. The purpose of a tort duty of care is to protect society's interest in freedom from harm, *i.e.*, the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort prin-

ciples, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.

Although the nature of the damage may be a useful point of distinction, it also signals more subtle differences in the roles that tort and contract play in our legal system. The differences include judicial evaluation of the status, relationship, and expectations of the parties; the ability of the parties to protect themselves against the risk of loss either by contractual provision or by insurance; and the manner in which the loss occurred. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 *F.*2d 1165, 1173 (3rd Cir.1981) (allowing recovery for damage to defective machinery resulting from fire caused by defect). This evaluation reflects, among other things, policy choices about the relative roles of contracts and tort law as sources of legal obligations. As among commercial parties in a direct chain of distribution, contract law, expressed here through the U.C.C., provides the more appropriate system for adjudicating disputes arising from frustrated economic expectations.

Some courts, however, have rejected the distinction between physical harm and economic loss as arbitrary, thereby allowing recovery in tort for repair costs and lost profits. *See, e.g., Berg v. General Motors Corp.*, 87 *Wash.*2d 584, 555 *P.*2d 818, 822–23 (1976) (purely economic loss, including lost fishing profits, recoverable in negligence against remote manufacturer of diesel engine); *cf. Emerson G.M. Diesel, Inc. v. Alaskan Enterprise*, 732 *F.*2d 1468, 1474 (9th Cir.1984) (recovery under strict liability for economic loss available in admiralty against manufacturer of diesel engine parts). Other courts have rejected the requirement of an accident as a prerequisite to recovery in negligence. *See, e.g., State ex rel. Western Seed Prod. Corp. v. J.R.*

*Campbell,* 250 *Or.* 262, 442 *P.*2d 215, 218 (1968) (recovery in negligence allowed against remote supplier for crop losses caused by defective seed); *see also, Nobility Homes of Texas v. Shivers, supra,* 557 *S.W.*2d at 78, 83 (purchaser of defectively designed and constructed mobile homes may recover in negligence and for breach of implied warranties under U.C.C., but not in strict liability).

Nonetheless, the weight of authority supports the proposition that economic expectations that are protected by the U.C.C. are not entitled to supplemental protection by negligence principles. *See Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc., supra,* 136 *Ariz.* at 549, 666 *P.*2d at 549 ("our conclusion that economic losses are best handled by contract law rather than tort law is applicable whether the theory involved is strict liability or negligence"); *Clark v. International Harvester Co., supra,* 99 *Idaho* 326, 581 *P.*2d 784, 794 (1978) (the law of negligence does not impose a duty to "build a tractor that plows fast enough and breaks down infrequently enough" for plaintiff to make a profit); *Moorman Mfg. Co. v. National Tank Co., supra,* 91 *Ill.*2d at 86, 61 *Ill.Dec.* at 754, 435 *N.E.*2d at 451 (purchaser may not recover in strict liability or negligence against manufacturer of defective grain storage tank); *Superwood Corp. v. Siempelkamp Corp.,* 311 *N.W.*2d 159, 162 (Minn. 1981) (no recovery in strict liability or negligence for lost profits or damage to hot plate press); Wade, "Tort Liability for Products Causing Physical Injury and Article 2 of the U.C.C.," *supra,* 48 *Mo.L.Rev.* at 26 n. 87 (substantial majority rule has come to be that economic losses are not actionable in negligence); Note, "Manufacturers' Liability for Economic Loss," *supra,* 66 *Colum.L.Rev.* at 929–31 (negligence is one of the least fruitful avenues of recovery for economic loss). Stated otherwise, the U.C.C. "is generally regarded as the *exclusive source* for ascertaining when a seller is subject to liability for damages if the claim is based on intangible economic loss not attributable to physical injury to person or harm to a tangible thing other than the defective product itself." Prosser &

Keeton, *supra*, § 95A at 680. In the present case, the commercial buyer understandably was disappointed in its purchase. The point remains, however, that the U.C.C. provides an adequate set of rights and remedies to resolve the differences between Spring Motors and the Ford defendants.

It follows from our determination that Spring Motors should be restricted to its U.C.C. remedies as against Ford and Turnpike Ford that the appropriate statute of limitations is the four-year time bar contained in *N.J.S.A.* 12A:2–725. More than four years elapsed between the date of the delivery of the trucks and the institution of this action against Ford and Turnpike Ford. Consequently, Spring Motors' suit against them is time-barred.

We also conclude that Spring Motors should be restricted to its U.C.C. remedies against Clark, which are time-barred because of the expiration of the four-year period of limitations provided by the Code. The trial court dismissed Spring Motors' warranty claim against Clark not because of late filing, but because of lack of privity, and the Appellate Division affirmed the dismissal of the warranty claim. 191 *N.J.Super.* at 48. Spring Motors did not cross-petition for certification on that issue and has not pursued it before us. Nonetheless, as we subsequently explain, we conclude that the better rule is to restrict parties that are part of a single distributive chain to the U.C.C. in a suit for economic loss arising out of a commercial transaction. Prosser & Keeton, *supra*, § 101 at 708.

We conclude that the absence of privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer. We reach that conclusion notwithstanding our recognition that the Code generally applies to parties in privity, *Herbstman v. Eastman Kodak Co.*, 68 *N.J.* 1, 9–10 (1975); *Heavner v. Uniroyal, Inc.*, *supra*, 63 *N.J.* at 150, and that no privity exists between Spring Motors and Clark.

Privity, the relationship between two contracting parties, developed as a means of limiting relief on warranties. At this late date, little purpose would be served by a lengthy discussion of the erosion of privity as a defense in modern products liability law. The first reported decision to recognize the defense was the nineteenth century case of *Winterbottom v. Wright*, 10 *M & W* 109, 152 *Eng.Rep.* 402 (Ex.1842). 2 Hawkland, *U.C.C. Series*, § 2–318 at 420 (1984) [hereinafter cited as 2 Hawkland]. In that case, the court sustained a demurrer to a suit by an injured coachman for breach of warranty against a third party who contracted to maintain the coach. In this century, however, *MacPherson v. Buick Motor Co.*, 217 *N.Y.* 382, 111 *N.E.* 1050 (1916), established that lack of privity between an automobile manufacturer and a consumer would not preclude the consumer's action for personal injuries and property damage caused by the negligent manufacture of an automobile. Subsequently, *Henningsen v. Bloomfield Motors* abolished privity as a defense to a similar action predicated on breach of implied warranties of fitness and merchantability. Later cases clarified that the breach of implied warranty action recognized in *Henningsen* was strict liability in tort. *H. Rosenblum, Inc. v. Adler, supra*, 93 *N.J.* 324; *Heavner v. Uniroyal, Inc., supra*, 63 *N.J.* 130; *Santor v. A & M Karagheusian, Inc., supra*, 44 *N.J.* 52.

More recently, strict liability in New Jersey has evolved as a means of permitting a consumer to recover for physical damage and direct economic loss against a remote seller, notwithstanding the absence of privity. Insofar as indirect economic losses arising out of a commercial transaction between business entities are concerned, we believe that the U.C.C., not tort law, provides the more appropriate analytical framework. By recognizing the supervening role of the U.C.C. in that context, we come closer to fulfilling the expectations of the parties and the intent of the Legislature. The intended effect of our decision is to satisfy the combined, if occasionally contending, goals of simplifying the law pertaining to business transactions and

providing a system of compensation that responds to the needs of the commercial world.

Fundamental to our decision is the role of privity in modern business law, a role that is often described in terms of vertical and horizontal relationships. A vertical relationship describes one that exists between parties in a distributive chain, *i.e.*, between a manufacturer, wholesaler, retailer, and ultimate buyer. A buyer within this chain that did not buy goods directly from the named defendant would be a "vertical non-privity plaintiff" as to that defendant. 2 Hawkland, *supra*, § 2–318:01 at 419; White & Summers, *supra*, § 11–2 at 399. Here, Spring Motors, which purchased the trucks from Ford, is in vertical privity with the Ford defendants, but not with Clark. Thus, Spring Motors is a vertical non-privity plaintiff as to Clark.

"Horizontal non-privity," on the other hand, describes the relationship between the retailer and someone, other than the buyer, who has used or consumed the goods. For example, in an action against a retailer, a "horizontal non-privity plaintiff" would refer to the buyer's spouse or child, but not to the buyer. White & Summers, *supra*, § 11–2 at 399.

In drafting the U.C.C., the Commissioners on Uniform State Laws acknowledged the decline of horizontal privity as a defense to an action for personal injuries caused by the purchase of defective goods. Consequently, section 318, adopted in New Jersey as *N.J.S.A.* 12A:2–318 and now identified as "Alternative A," extends warranties horizontally to "any natural person who is in the family or household of [the] buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty." With respect to vertical privity, the drafters specifically state that the section is "neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain." Official Comment 3, § 2–318.

Courts in some states that have adopted Alternative A, however, have abolished the requirement of horizontal privity and allowed "any person," natural or legal, to sue a party in the distributive chain for breach of warranty. *See, e.g., Salvador v. Atlantic Steel Boiler Co.*, 457 *Pa.* 24, 26, 319 *A.*2d 903, 904 (1974) (lack of horizontal privity may no longer bar the plaintiff from recovering for personal injuries under breach of warranty); *JKT Co., Inc. v. Hardwick*, 274 *S.C.* 413, 416, 265 *S.E.*2d 510, 512 (1980) (no valid reason exists for distinguishing between consumer plaintiffs and corporate plaintiffs on the issue of horizontal privity).

In other states, legislatures have refused to adopt Alternative A. California was the first to criticize the section as "a step backward" and to omit the section from its version of the Code. Permanent Editorial Board note, following Official Comment to section 2–318. Still other states developed variants of section 318. In 1966, to stem the proliferation of non-uniform provisions, the members of the Permanent Editorial Board of the U.C.C. recommended Alternatives B and C. *Id.;* 3 Anderson, *Uniform Commercial Code*, § 2–318:2 at 400 (3rd ed. 1983) [hereinafter cited as Anderson]. Respectively, these alternatives provide that:

### ALTERNATIVE B

A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

### ALTERNATIVE C

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury of the person of an individual to whom the warranty extends.

Alternatives B and C go beyond Alternative A in eroding the privity defense. Alternative C, for example, allows "any per-

son" on the horizontal level, including a corporation, to sue for breach of warranty. *Cf. N.J.S.A.* 12A:1–201(30) (defining person as an individual or an organization) and *N.J.S.A.* 12A:1–201(28) (defining organization as including a corporation). Some treatises declare that Alternative C eliminates the requirement of vertical privity, 2 Hawkland, *supra,* § 2–318:04 at 430; Anderson, *supra,* § 2–318:31 at 417, but another text disagrees, White & Summers, *supra,* §§ 11–5 to –6 at 406–10.

 The Permanent Editorial Board's comment on Alternative C states that the section reflects "the trend of more recent decisions as indicated by Restatement of Torts 2d § 402A * * *, extending the rule beyond personal injuries." As previously indicated, in most jurisdictions section 402A precludes claims for economic loss. In New Jersey, however, a consumer may recover direct economic loss in a strict liability action against a remote supplier. *Santor v. A & M Karagheusian, Inc., supra,* 44 *N.J.* 52. Because the Code provides the more appropriate framework for resolving disputes between commercial entities, we eschew permitting recovery by a business entity for economic loss under principles of strict liability. Nonetheless, it is consistent with the principles underlying *Santor* and with the intent of the Code's drafters to recognize a claim under the U.C.C. for economic loss in a breach of warranty action without regard to vertical privity.

 Furthermore, a plaintiff in a suit for breach of warranty against a remote seller, like a plaintiff in a strict liability action, need not establish privity with or negligence by the defendant. To this extent, our recognition of a warranty action for economic loss by a commercial buyer parallels our recognition in *Santor* of a similar claim by a consumer. One significant difference, of course, is that the plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient. By bringing the action within the ambit of the Code, we believe we come closer to fulfilling the expectations of the parties and the

intention of the Legislature that the Code should govern commercial transactions.

Our conclusion also is consistent with the proposition that the Code drafters have left it to the courts to determine whether vertical privity should be required in a warranty action between a seller and a remote buyer. *See, e.g., Omaha Pollution Control Corp. v. Carver-Greenfield*, 413 *F.Supp.* 1069, 1088–90 (D.Neb.1976) (the Code did not intend to set any limits regarding vertical privity); *Autrey v. Chemtrust Industries Corp.*, 362 *F.Supp.* 1085, 1092 (D.Del.1973) (section 318 has no effect on Florida's developing case law when a nonconsumer seeks to recover economic loss damages from a remote manufacturer on breach of warranty); *Morrow v. New Moon Homes, Inc., supra*, 548 *P.*2d at 287–88 (the Code leaves to the courts the extent to which vertical privity will be required); *J.G. Kassab v. Central Soya*, 432 *Pa.* 217, 246 *A.*2d 848, 856 (1968) (nothing prevents judicial abolition of vertical privity in breach of warranty actions for property damage); *Nobility Homes of Texas, Inc. v. Shivers, supra*, 557 *S.W.*2d at 81 (vertical privity is not a requirement for a consumer to recover economic losses in a U.C.C. breach of implied warranty action); White & Summers, *supra*, § 11–3 at 403 (many courts have gone well beyond Alternative A in permitting horizontal and vertical nonprivity plaintiffs to recover).

Eliminating the requirement of vertical privity is particularly appropriate in the present action where Spring Motors read advertisements published by Clark, specifically requested Clark transmissions, expected the transmissions to be incorporated into trucks to be manufactured by Ford, contracted with Ford only, and now seeks to recover its economic loss. Given the nature of the transaction and the expectations of the parties, the absence of a direct contractual relationship should not preclude Spring Motors from asserting a cause of action for breach of express warranty against Clark. Because the Code, not principles of tort law, governs the relationship

between Spring Motors and Clark, the appropriate period of limitations is that provided by the Code. As previously indicated, the expiration of this period bars Spring Motors' claim against Clark.

Our recognition of a warranty extending from Clark to Spring Motors should be compared with our recognition in *Aronsohn v. Mandara*, 98 *N.J.* 92 (1984), of an implied covenant running from a building contractor to a subsequent homeowner. By predicating the *Aronsohn* opinion on an implied contractual provision that the subject of the building contract, a patio, would be constructed in a good and workmanlike manner, we found it unnecessary to determine whether the homeowner could recover in negligence against the builder. In suits relating to home improvements, *Aronsohn* focuses attention on the original contract to determine the scope of the duty owed by the building contractor. In the present case, involving a commercial setting for the sale of goods, we likewise focus on the parties' expectations and contractual arrangements to determine a remote buyer's right to recover for economic loss. From that perspective, the buyer's right is most appropriately appraised under the U.C.C. Thus, our decision in *Aronsohn* creating an implied assignment of contract rights to a subsequent purchaser comports with the present decision to abolish vertical privity and to allow an ultimate purchaser to sue a remote manufacturer under the Code.

Because any action by Spring Motors against Clark is time-barred, we need not determine the outer limits of a suit by an ultimate purchaser against a remote supplier for economic loss. Therefore, we reserve determination on the effectiveness of a remote manufacturer's disclaimer or limitation on express and implied warranties to an ultimate purchaser that did not have the opportunity to negotiate over the terms of the agreement. *N.J.S.A.* 12A:2–316; *N.J.S.A.* 12A:2–719; White & Summers, *supra*, § 11–6 at 409 (the extent to which a remote seller may disclaim warranties is an unresolved issue). We note, however, that in certain circumstances a buyer may recover incidental

and consequential damages. *N.J.S.A.* 12A:2–715. We also leave unreviewed the Code requirement that a purchaser notify the seller about the defective condition of the product. *N.J.S.A.* 12A:2–607(3). Similarly, we do not resolve whether a warranty of fitness for a particular purpose, unlike an implied warranty of merchantability, extends only to parties in privity with the seller. *See Pawelec v. Digitcom, Inc.,* 192 *N.J.Super.* 474, 477–78 (App.Div.1984) (holding that implied warranty of fitness for a particular purpose, unlike implied warranty of merchantability, requires privity). For our purposes, it is sufficient to acknowledge that a commercial buyer in a distributive chain may maintain an action under the U.C.C. for purely economic loss arising out of a breach of warranty by a remote supplier.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the dismissal of the complaint as to all defendants.

HANDLER, J., concurring.

In this case the Court rules that common-law causes of action sounding in strict products liability and negligence against the supplier of a product are no longer available to "commercial buyers" who incur economic loss attributable to a defective condition in the product. The Court holds specifically that such a buyer may recover economic damages from a "remote supplier in a distributive chain" only for breach of warranty under the Uniform Commercial Code (U.C.C.), *N.J.S.A.* 12A:2–714. *Ante* at 561. The concern that prompts me to write specially is not so much the application of this holding to the facts of this case but its possible reach to situations different from that presented by this litigation.

I agree with the Court that under the particular circumstances of this case, resort to the Uniform Commercial Code is appropriate. Spring Motors Distributors, Inc. (Spring Motors) is a commercial entity engaged in the business of leasing

trucks, which it purchases for use in the regular course of its business. Spring Motors maintains a fleet of 300 trucks. In this case it purchased 14 trucks from Ford Motor Co. (Ford). There is nothing in the record to suggest that the transaction was anything but a regular and typical commercial undertaking for Spring Motors or that the transaction between these experienced parties was other than a common commercial event for them. Further, the contract between Spring Motors and Ford specified that the trucks would be supplied with transmissions manufactured by Clark Equipment Co. (Clark). Thus, Spring Motors apparently had the commercial experience, economic status, and bargaining power to be able to specify to its principal supplier, Ford, that it required a particular transmission and to designate Clark as the supplier of that component.

Almost immediately, Spring Motors and its lessees began experiencing problems with the Clark transmissions. After several unsuccessful attempts to repair the transmissions, Spring Motors initiated this suit. The claims, based on breach of warranty, negligence, and strict liability, were filed four years and one month after delivery of the trucks, beyond the statute of limitations prescribed by the U.C.C., *N.J.S.A.* 12A:2–725. Spring Motors sought damages based on the decrease in value of the trucks, expenses incurred in repairing and replacing parts, and lost profits.

The Court characterizes Clark as a "remote supplier," one not standing in direct privity with Spring Motors. The absence of privity in its traditional sense would generally constitute an insurmountable obstacle to recovery of losses for breach of contract. *But cf. Aronsohn v. Mandara*, 98 *N.J.* 92 (1984) (finding an implied assignment of home-improvement contract in absence of direct privity and allowing suit for breach of implied warranty against contractor by successor home-owner who was not a party to original contract). Thus, in this case, in finding under the U.C.C. a potential contract remedy for Spring Motors against Clark for losses attributable to the defective transmissions, the Court takes the significant step of eliminat-

ing privity—a direct contractual relationship—as a prerequisite for a cause of action based on a commercial contract. *Ante* at 582.

I do not denigrate the jurisprudential significance of the elimination of direct privity as a basis for an action under the U.C.C. It ranks in importance with our recent willingness to dispense with traditional privity in an action on an ordinary contract. See *Aronsohn, supra.* Nevertheless, under the circumstances of this case, the privity requirement as a bar to a cause of action may have been somewhat exaggerated or magnified. In my opinion, direct privity need not have presented a bar to relief in this case. It is not difficult to envisage the transaction as a tripartite or three-party arrangement. Each of the parties stood in a fairly close, contractual relationship with the others, albeit, as between Spring Motors and Clark possibly not in direct or immediate privity in its conventional sense. *See Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 150 (1973). Although Spring Motors and Clark did not contract directly with each other, Clark was specified by Spring Motors to Ford as a supplier. Clark thus became a party to the transaction, in a sense acting with and through Ford, at the direction of Spring Motors. In such circumstances, the nexus or close relationship that is required by the privity rule might be reasonably satisfied. *See Thompson Farms v. Corno Feed Products,* 173 *Ind.App.* 682, 366 *N.E.*2d 3 (1977) (court allowed recovery on implied warranty notwithstanding lack of privity when the intermediate seller was shown to be an agent of manufacturer and the buyer had seen advertisements of the product exhibited by the agent).

I mention the possibly attenuated privity aspect of this case to emphasize that the result that is reached by the Court can be justified by more than a disenchantment with the privity doctrine in its rigid traditional form. The regular commercial context in which the transaction took place, the relative contractual closeness of the parties, their course of dealings with one another, their business experience, and their apparent compara-

ble bargaining power are factors that collectively indicate that the ensuing transaction is the kind that is typically the concern of the U.C.C. Consequently any asserted claims arising out of this transaction are most appropriately addressed under the U.C.C. I therefore read the Court's opinion narrowly. I understand the Court's ruling—that the Uniform Commercial Code is the exclusive remedy for a commercial consumer's claim of economic loss against its "remote seller"—to be restricted to the circumstances of this case.

It is also important to emphasize that the selection by the Court of a particular remedy does not turn on a label. It would not be correct to consider the U.C.C. remedy to be exclusively applicable to a purchaser's claim simply because the transaction can be viewed as "commercial" or having occurred in the course of business, or because the ultimate purchaser is in business or is itself a commercial entity. For example, the ultimate purchaser of a vehicle could be a travelling salesperson or a small-scale trucker, or a carpenter, plumber, electrician, or landscape gardener. It does not follow automatically that if the vehicle proves to be defective, the U.C.C. shall apply as the exclusive remedy to govern the recovery of direct or consequential economic loss solely because such purchaser is in business or bought the vehicle for use in business. Rather, the analysis should turn on whether a purchase made in that kind of setting, even if for a business or commercial purpose, is sufficiently distinguishable from a purchase for personal use by an ordinary private consumer to justify a difference in remedial treatment.

In *Seely v. White Motor Co.*, 63 *Cal.*2d 9, 45 *Cal.Rptr.* 17, 403 *P.*2d 145 (1965), Justice Peters disagreed with the majority's conclusion that strict liability should never apply to a claim against a remote seller for damages of an economic nature. He would have allowed such a claim when the plaintiff is an "ordinary consumer." In *Seely,* plaintiff had bought a truck for use in his business of heavy-duty hauling. But it was the only truck he owned; he was "not a fleet-owner who bought

trucks in the course of his business. He was the final link in the marketing chain, having no more bargaining power than does the usual individual who purchases a motor vehicle on the retail level." *Id.* at 28, 45 *Cal.Rptr.* at 30, 45 *P.*2d at 158. Based on these facts, Justice Peters would have considered the plaintiff to be an "ordinary consumer," and as such, entitled to claim damages for economic harm under a tort theory of recovery.

Justice Peters' reasoning in *Seely* is parallel to that reflected in the Court's opinion in this case. The reasons we give as justification for limiting commercial purchasers to their U.C.C. remedies suggest conversely that the U.C.C. may be inapplicable in cases involving purchasers who are different from those involved in this case. As further observed by Justice Peters in *Seely*, the important considerations are "the relative roles played by the parties to the purchase contract and the nature of their transaction." *Id.* at 21, 45 *Cal.Rptr.* at 25, 403 *P.*2d at 153. Since "the rules governing warranties were developed to meet the needs of 'commercial transactions,' ... then why not look to the *transaction* between the buyer and the seller and see if it was a 'commercial' transaction rather than a sale to an ordinary consumer at the end of the marketing chain?" *Id.* at 26, 45 *Cal.Rptr.* at 28, 403 *P.*2d at 156. Therefore the U.C.C. should not be applied uncritically simply because the buyer is in business.

In its determination of the available causes of action and remedies for economic loss attributable to a defective product, a court should consider not only that the transaction or the purchase is "commercial" but that the parties, among other things, are commercially experienced and have comparatively equal bargaining power in dealing with one another with respect to the underlying transaction. In considering the good sense and fairness in using the U.C.C. as an exclusive remedy, supplanting strict products liability, the opinion aptly observes that strict products liability is less likely to be invoked when the parties have equal bargaining power. *Ante* at 576. Converse-

ly, the reasons for applying strict products liability, or negligence remedies, are stronger when the parties are unequal in bargaining strength, rendering the modes of relief available under the U.C.C. unfair or inappropriate.

The significance of comparable bargaining power is also underscored by the nature of warranty remedies that may be available under the U.C.C. In addition to other issues left open, the Court specifically reserves determination of the effectiveness of a remote manufacturer's disclaimer of implied warranties. *Ante* at 588. A real difficulty posed is that the ultimate purchaser frequently would not have had the opportunity to negotiate with the remote supplier. Additionally, the final purchaser in a distributive chain will often be unaware of warranty exclusions in the contract between the remote supplier and the distributor. Applying such an exclusion might not afford the notice contemplated by the "conspicuousness" requirement of the warranty disclaimer provision of the U.C.C. *N.J.S.A.* 12A:2–316; *Gladden v. Cadillac Motor Car Div.,* 83 *N.J.* 320, 331 (1980); *Zabriskie Chevrolet, Inc. v. Smith,* 99 *N.J.Super.* 441 (Law Div.1968). These concerns can have a crucial bearing upon the nature and availability of relief. *See Candlelight Homes, Inc. v. Zornes,* 414 *N.E.*2d 980 (Ind.App. 1981) (court follows majority rule that remote purchaser *cannot* recover economic damages under implied warranties). *Compare Western Equipment Co. Inc. v. Sheridan Iron Works, Inc.* 605 *P.*2d 806 (Wyo.1980) (even though privity for economic loss was not a requirement, court enforced against ultimate purchaser implied warranty exclusions in contract between remote supplier and intermediate seller) *with Groppel Co., Inc. v. United States Gypsum Co.,* 616 *S.W.*2d 49 (Mo. App.1981) (warranty exclusions by remote supplier to its immediate purchaser not honored as against ultimate purchaser).

While a suit for breach of warranty is still theoretically available against the immediate supplier based on whatever warranties were included in the agreement, the enforcement of implied warranty exclusions may effectively deny an aggrieved

consumer any remedy at all if redress cannot be secured from the immediate seller. Thus, in certain circumstances the use of such asserted disclaimers may militate against the use of U.C.C. remedies entirely.

There may also be special problems that occur with respect to implied warranties of fitness for a particular purpose. Under *N.J.S.A.* 12A:2–315, for such a warranty to attach, the seller must know at the time of the contract the purpose for which the goods are required and the purchaser must rely on the seller's judgment in making his selection. However, a remote purchaser will not often be in such a relation with the seller. *See Industrial Graphics, Inc. v. Asahi Corp.*, 485 *F.Supp.* 793 (D.Minn.1980); *see also R. & L. Grain Co. v. Chicago E. Corp.*, 531 *F.Supp.* 201 (N.D.Ill.1981) (implied warranty exclusions effective only because plaintiff was considered third party beneficiary of original contract; manufacturer knew at time of contracting of ultimate purchaser's existence); *cf. Ontai v. Staub Clinic & Hosp.*, 659 *P.*2d 734 (Hawaii 1983) (plaintiff suffering personal injuries when an X-ray table collapsed, allowed to sue on manufacturer's implied warranty of fitness, because manufacturer was aware of anticipated use of table).

Another consideration in determining what avenues of relief are open to parties for loss occasioned by defective products is risk allocation. In further support of an exclusive U.C.C. remedy, the Court states that Spring Motors is "at least as well situated as the defendants to absorb the impact of economic loss, perhaps even better situated." *Ante* at 576. Other purchasers, however, may not be so situated even though their ultimate use of the product may be "commercial." As noted by the Court, *ante* at 567, the manufacturer is generally better able than an individual purchaser to spread the cost of the risk of harm caused by a defective product. We have said many times since our decision in *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358 (1960), that one of the primary purposes of strict liability is to allocate the risk to the party better able to absorb it. *E.g., Beshada v. Johns-Manville Products Corp.*, 90

*N.J.* 191, 205 (1982); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 173 (1979). Where the parties do not bargain with comparable economic strength, as distinguished from the circumstances of this case, the inferior risk-bearing position of the aggrieved purchaser may militate in favor of continuing common-law avenues of relief.

If the nature of the transaction implicates genuine concerns for the purchaser's contractual ability to protect itself, resort to the U.C.C. as the exclusive mode of recovery may not be appropriate. Although the Court holds today that privity does not preclude a suit against a remote supplier, one can foresee situations in which a defective product will cause economic harm to a purchaser who should not be denied access to strict products liability or negligence causes of action in light of the inadequacy of the U.C.C. relief.

This analysis, I would emphasize, is not inconsistent with the Court's opinion, which focuses on the reasons in this case for applying the U.C.C., particularly, equal bargaining power and ability to allocate risks. Logically, if those reasons are not present in a given case, alternative modes of recovery, such as found in the law of strict products liability or negligence, should be available. These theories of law have developed over the years to provide just relief and adequate redress to innocent persons who have been victimized by the wrongful conduct of others. Consumers who are not in a position reasonably to protect themselves against economic loss attributable to a defective product should not be insulated from the ameliorative reach of the law simply because they are also commercial purchasers.

We have recognized in an appropriate context the propriety of recovery by a purchaser-consumer based on strict products liability for economic losses attributable to a defective product. *Santor v. Karaghesian*, 44 *N.J.* 52 (1965). The Court's opinion in this case suggests an acceptable narrowing of the breadth of our holding in *Santor*. It does not, however, serve to displace

that decision or to signal a different rule in cases in which the requirements of sound public policy and fairness call for its continued application.

For these reasons, I concur in the opinion of the Court.

HANDLER, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.