**MAINLINE TRACTOR & EQUIPMENT COMPANY, INC., Golden–Flo, a Partnership, Carl Cobb, Sr. and Nancy Cobb, Plaintiffs,**

v.

**NUTRITE CORPORATION and Monsanto Company, Defendants.**

**No. 2:95–CV–9.**

United States District Court, D. Vermont.

Aug. 12, 1996.

Peter Forbes Langrock, Langrock, Sperry & Wool, Middlebury, VT, for Mainline Tractor & Equipment Company, Inc., Golden–Flo, Carl Cobb and Nancy A. Cobb.

Robert S. DiPalma, Paul, Frank & Collins, Inc., Burlington, VT, for Nutrite Corporation.

Joseph Patrick Bauer, Bauer, Anderson & Gravel, Burlington, VT, R. Gerald Barris, Thomas H. Wilson, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., Springfield, IL, for Monsanto Company.

## OPINION AND ORDER

SESSIONS, District Judge.

This is an action for loss resulting from a reduced crop yield allegedly caused by the failure of an herbicide, sold by Nutrite Corporation ("Nutrite") and manufactured by Monsanto Company ("Monsanto"), to effectively control crabgrass. Pending before the Court is Defendant Monsanto's Motion for Summary Judgment.[1] Plaintiffs oppose this motion. Plaintiffs' complaint against Monsanto is predicated on theories of strict liability, negligence, negligent misrepresentation, and breach of express and implied warranties. In its motion, Monsanto, characterizing Plaintiffs' loss as purely economic, argues that tort remedies are not available for such loss and that any recovery under contract theories is prohibited because Monsanto and Plaintiffs are not in privity. For the reasons discussed below, the Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

For purposes of deciding the instant matter, the Court assumes the following facts are true. Plaintiffs, Mainline Tractor & Equipment Company, Golden–Flo, and Carl and Nancy Cobb, own farmland in Grand Isle, Vermont. Carl Cobb, Sr., ("Cobb") farms these collective lands, which are used for growing silage corn.[2] From 1989 to 1991,

1. Initially, Monsanto also sought summary judgment against co-Defendant and Cross-claimant Nutrite. However, since the filing of Monsanto's motion, Nutrite and Monsanto have agreed to dismiss their respective cross-claims. (Paper # 61).

2. The record is unclear as to the precise relationship between Mainline Tractor & Equipment

Cobb sold little, if any, of his crop for cash.[3] In 1993 and 1994, Cobb planted approximately 208 acres of silage corn, some of which he intended to use as feed for his herd of fifty heifers. The rest he planned to sell to dairy farmers in the surrounding area. However, both years, his fields were overrun with crabgrass, thereby substantially reducing his expected yields.

Cobb has been a part-time farmer since at least 1974.[4] Every year he has had his fields sprayed to prevent weed infestation. Prior to 1993, Cobb never had a problem with crabgrass on the lands he farmed. In 1993, he contracted with Nutrite, a fertilizer manufacturer and distributor of herbicides, for the spraying of his fields. That year, Nutrite purchased 538 gallons of Monsanto's herbicide, Bulk Lasso Micro–Tech ("Micro–Tech"), from Agway Inc., for application on the fields of farmers in and around Grand Isle County, Vermont. Nutrite is not a distributor or dealer for Monsanto. Monsanto, however, shipped the herbicide directly to Nutrite's facility in Swanton, Vermont on May 3, 1993.

Using its stock supply, Nutrite custom-applied Micro–Tech to Cobb's fields in 1993. In mid-July, Cobb reported a lack of control of crabgrass to Nutrite's Sales Manager, Charles Custeau. The problem prevailed, and Cobb again complained to Nutrite on September 2, 1993. On October 12, 1993, in response to another complaint from Cobb, Mr. Custeau inspected Cobb's fields and notified Holly Butka, a Local Market Manager for Monsanto, of the difficulties Cobb was experiencing. Def.'s Ex. B, Custeau Dep. at 61–72. Ms. Butka has an extensive educational background in agriculture and her responsibilities include selling Monsanto products by, *inter alia*, encouraging retailers

to place orders with its distributors. In accordance with custom and practice, Nutrite is supposed to contact Monsanto when there are problems with its products. For reasons not apparent from the record, Cobb's problems with crabgrass were never remedied by Nutrite or Monsanto.

Micro–Tech is designed to control crabgrass and other weeds in various crops, including silage corn. Attached to the Micro–Tech product is a label booklet or label providing information about its uses. Def.'s Ex. O. In its "Directions for Use" section, the label booklet, applicable during the relevant time period, states: "Micro–Tech herbicide is recommended for control of yellow nutsedge and the annual grasses and broadleaf weeds listed in the WEEDS CONTROLLED section of this label." Under the "Weeds Controlled" section, the label specifically indicates that Micro–Tech controls crabgrass.

In the 1993–94 label booklet, there is also a section entitled "Limit of Warranty and Liability." With respect to warranties, this section provides, in pertinent part:

This Company warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet ("Directions") when used in accordance with those Directions under the conditions described therein. NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OF [sic] MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

Company, Golden–Flo, and the Cobbs. However, the following exchange between Monsanto's counsel and Carl Cobb, Sr., during the latter's deposition provides:

Q. And when did you start farming on the acreage in Grand Isle?
A. Grand Isle, we picked that—we purchased that, I believe, in '76.
Q. And what land did you purchase in '76?
A. We purchased what was presently owned by Mainline Tractor and Equipment Company.
Q. Had you farmed any additional acreage?
A. Yes.

Q. And what acreage, what additional—
A. Later I purchased what is known as Golden–Flo, the former Baker Farm, which was 237 acres at the time I bought it.
Def.'s Ex. A., Cobb Dep. at 5–6. Moreover, the respective briefs appear to assume that the Cobbs are the only real parties in interest in this matter.

3. What was done with Cobb's crop in 1992 is not apparent from the record.

4. Cobb is also employed as a real estate agent for Foley Real Estate, Co.

It is undisputed that all Monsanto products applied to Cobb's fields met the chemical description on the label.

Addressing liabilities, the section further provides that the exclusive remedy for any losses resulting from the use of the product is the purchase price paid for the quantity involved or the replacement of such quantity. It states:

THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY. IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Plaintiffs, including Cobb, did not read the label booklets or labels. Rather, Cobb relied on the information that Nutrite employees obtained from these and other published representations by Monsanto, which was relayed to him. Cobb was also familiar with Monsanto's general reputation for quality products as well as its advertising in agricultural magazines.

Despite his difficulties with Nutrite and the Micro–Tech product in 1993, Cobb asked Nutrite to spray his fields the following year. In 1994, Cobb's fields were sprayed with two Monsanto products, Micro–Tech and Harness/Plus. Prior to adding Harness/Plus to the mixture, Mr. Custeau spoke with Ms. Butka. While not specifically mentioning Cobb, Mr. Custeau described Cobb's previous problems to Ms. Butka, who recommended the use of Harness/Plus. The Harness/Plus applied to Cobb's fields came from a five gallon promotional container given to

Nutrite by Monsanto. Because Nutrite did not have to pay for the sample of Harness/Plus, it did not charge Plaintiffs for it.

Again, in mid-July of 1994, Cobb noticed a problem with weed control over a sizeable percentage of his fields, and contacted Nutrite to report it. Within a few days, Mr. Custeau, and another Nutrite employee, Dan Bois, came out to inspect Cobb's fields. Thereafter, Mr. Custeau notified Ms. Butka of the problem. On August 19, 1994, approximately two weeks after she spoke with Mr. Custeau, Ms. Butka viewed Cobb's fields to investigate the complaints. There is no evidence as to what actions, if any, Nutrite or Monsanto took to correct the problem.

In September, 1994, Cobb also contacted Glenn Rogers, a Regional Farm Business Manager Specialist with the University of Vermont Extension Service, about his crabgrass problem. On October 7, 1994, Mr. Rogers inspected Cobb's fields. He noted that in some fields, there was a lack of control of crabgrass over seventy-five to eighty percent of the field.

Consequently, Cobb experienced reduced yields and lower quality. To determine his losses from the crabgrass infestation, Cobb took weighted samples of his silage corn. In 1993, Cobb weighed almost every wagon load and found that his yield per acre was substantially lower than it had been in 1992. In 1994, Cobb again weighed his corn to compare the yield on areas where he had good weed control to the areas where he had poor control. The areas with good control generally yielded thirty-four tons per acre, while the areas with crabgrass infestation produced as little as five tons per acre. He also found the 1994 yield in areas without a crabgrass problem to be substantially higher than any yield in 1993.

In assessing their damages, Plaintiffs are using an average yield of twenty-five tons per acre. They are then subtracting the actual yield per acre from twenty-five and multiplying it by $25.00, the average price of silage corn during the relevant time period.

## DISCUSSION

A court shall grant summary judgment when it finds "that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In analyzing the record, the court must view the evidence in the light most favorable to the nonmoving party and resolve all ambiguities in its favor. *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 316 (2d Cir.1992).

Plaintiffs seek recovery under the products liability theories of strict liability, negligence and breach of express and implied warranties for the reduced silage corn yields that allegedly occurred as a result of Micro–Tech's failure to control crabgrass. They also claim negligent misrepresentation. Because the Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a)(1), it must apply Vermont law in deciding all substantive issues. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). With noted exceptions, the issues currently before the Court are a matter of first impression in Vermont, and thus, the Court must anticipate what the Vermont Supreme Court would do if faced with similar circumstances. Nonetheless, the parties agree that this Court's previous decision in *Vermont Plastics, Inc. v. Brine, Inc.*, 824 F.Supp. 444 (D.Vt.1993), *aff'd*, 79 F.3d 272 (2d Cir.1996), is relevant to the instant matter.

### A. An Overview of Products Liability Law

■ Products liability law evolved in response to a public policy judgment that purchasers lacked protection from dangerous products and that manufacturers were in a better position than ordinary consumers to bear the risk of loss. Thus, when faced with a products liability action, courts' most common concerns are: 1) whether the public needs protection from the alleged harm, independent of any contractual obligation, and 2) whether the purchaser has the bargaining power to protect itself from foreseeable losses.[5] Or to put it more simply, in determining which remedies are appropriate, the court must, as a threshold matter, identify the kind of harm a complainant has suffered and the kind of complainant.

### 1. Defining the Harm

■ It is well-settled that manufacturers may be liable in strict liability or negligence to ultimate users for bodily injury or harm to other property caused by a defective product. *See, e.g., East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); Restatement (Second) of Torts § 402A (1965). However, courts have demonstrated a "persistent unwillingness" to use tort theories to protect against economic loss. Richard E. Spiedel, *Warranty Theory, Economic Loss, and the Privity Requirement: Once More into the Void*, 67 B.U.L.Rev. 9, 19 (1987). Not surprisingly, Plaintiffs contend that they have suffered property damage as a result of applying the Micro–Tech, while Monsanto argues that the harm suffered is purely economic.

■ The line between property damage and economic loss can often be obscure, *see* Swanson, *supra*, at 141, and this case is no exception. In the traditional property damage cases, the defective product damages other property. *East River*, 476 U.S. at 867, 106 S.Ct. at 2300. On the other hand, in an economic loss case, the product injures only itself and damages are sought for inadequate product value and consequent loss of profits. *See* James J. White & Robert S. Summers, *Uniform Commercial Code*, § 11–4 at 534 (3d ed. 1988).

The case at bar is somewhat of a hybrid. Admittedly, the silage corn, property other than the defective product, was damaged. Nonetheless, the gravamen of Plaintiffs' complaint is that the Micro–Tech proved inadequate for its purpose, causing Plaintiffs to have a less successful yield and thereby to lose profits. *See Bailey Farms, Inc. v. NOR–AM Chemical Co.*, 27 F.3d 188, 190

---

5. For a thorough discussion of the policy rationales behind products liability law, see Steven Swanson, *The Citadel Survives a Naval Bombardment: A Policy Analysis of the Economic Loss Doctrine*, 12 Tul.Mar.L.J. 135, 158–60 (1987).

(6th Cir.1994). Accordingly, this Court finds that Plaintiffs' harm is better characterized as economic loss than property damage.

### 2. *Defining the Complainant*

Many courts recognize that ordinary consumers are in a more tenuous bargaining position vis-a-vis manufacturers than their commercial counterparts. *See, e.g., Spring Motors Distributors, Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660, 670 (1985); *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 24, 403 P.2d 145, 152 (1965) (Peters, J., dissenting) ("[w]hat is important is not the nature of the damage but the relative roles played by the parties to the purchase contract ..."). Accordingly, Plaintiffs argue that farmers are ordinary consumers, rather than commercial entities, and Monsanto takes the opposite view.

■ Perhaps the most persuasive authority on this issue is a section of Vermont's Uniform Commercial Code ("UCC") on a manufacturer's ability to limit its liability for defective consumer goods. Importantly, this section, Vt.Stat.Ann. tit. 9A § 2–316(5) (1994), incorporates by reference a definition of consumer, by stating:

The provisions of subdivisions (2), (3) and (4) of this subsection shall not apply to sales of new or unused consumer goods or services. Any language, oral or written, used by a seller or manufacturer of consumer goods and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties shall be unenforceable. For the purposes of this section, "consumer" means consumer as defined in chapter 63 of Title 9.

Chapter 63 of Title 9 then provides:

"Consumer" means any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his trade or business but for his use or benefit or the use or benefit of a member of his household or in connection with the operation of his household or a farm whether or not the farm is conducted as a trade or business.

Vt.Stat.Ann. tit. 9 § 2451a(a) (1984 & Supp. 1992). Plainly, this section identifies a farmer as an ordinary consumer, regardless of whether the farm is conducted as a business.

A review of the legislative history of § 2451a(a) provides insight into the unique position of farmers in Vermont. In testimony before the Senate Agriculture Committee on amending the definition of consumer to include farmers, Counsel for the Department of Agriculture, William Rice, stated that the purpose was to provide farmers with additional leverage. "It gives them the ability to protect themselves from unfair practices that ... in many cases are aimed directly at farmers." Senate Agriculture Comm., 22 (April 16, 1985) (testimony of William Rice) [hereinafter "Rice Testimony"]. Responding to a question from the Committee about why farmers had less bargaining power than other businesses, Mr. Rice testified:

The reason that I think farmers are different in kind, in some respects, than a lot of other businesses, is that they are used to writing large checks, they're out there on their own, they're isolated. They have very little communication, I think, at least relative to other types of business—with other people, and I think that they are more susceptible than most businessmen to scams, and other kinds of problems.

*Id.* at 19.

■ As noted above, the emphasis in categorizing purchasers in products liability law is on the relative bargaining powers of the parties. With that in mind, the Court finds that Plaintiffs are more like ordinary consumers than commercial entities, and thus, it will treat them accordingly. This characterization seems particularly appropriate given that Plaintiffs have sold relatively little of their silage corn for cash, at least in the last few years, and that Cobb himself holds other employment.

### B. *Issues in this Case*

In *Vermont Plastics,* this Court predicted that Vermont would deny recovery for negligence to a commercial entity seeking purely

economic losses caused by a defective product made by a remote supplier. 824 F.Supp. at 449. However, the Court specifically refrained from addressing "the more closely divided question" of whether an ordinary consumer could recover for purely economic loss. *Id.* Furthermore, it denied relief under a theory of breach of implied warranty by refusing to abandon the privity requirement, "at least when all parties are sophisticated business entities." *Id.* at 454.

Having found that Plaintiffs are best characterized as ordinary consumers seeking recovery for economic loss, the primary issues before the Court are: 1) whether ordinary consumers can recover for purely economic loss; and 2) whether Vermont would abandon the privity requirement in contract theories when the purchaser is an ordinary consumer.

### 1. *Recovery for Economic Loss under Tort Theories*

Plaintiffs claim they are entitled to relief under the tort theories of strict liability, negligence and negligent misrepresentation. Monsanto argues that such relief is not available because Plaintiffs' loss is economic.

### a. *Strict Liability and Negligence*

Although an admiralty case, *East River,* 476 U.S. at 858, 106 S.Ct. at 2295, is considered the seminal case on products liability claims predicated on tort theories. It involves a malfunctioning steamship turbine which was sold to East River by Transamerica. The Supreme Court held that "whether stated in negligence or strict liability, no products liability claim lies in admiralty when a commercial party alleges injury only to the product itself resulting in purely economic loss." Rather, the proper course of recovery is in contract under breach of express and implied warranties.[6]

Notably, the holding was restricted to commercial parties. The Supreme Court reasoned "[s]ince a commercial situation generally does not involve large disparities in bargaining power, we see no reason to in-

trude into the parties' allocation of the risk." *Id.* at 873, 106 S.Ct. at 2303.

The *East River* court reviewed the preeminent land based products liability decisions on the recovery of economic loss, namely *Seely,* 45 Cal.Rptr. at 17, 403 P.2d at 145, and *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), in reaching its result. In *Seely,* which represents the majority view, the purchaser bought a truck for use in his business of heavy duty hauling. The truck was defective and caused an accident. The purchaser sued the manufacturer of the truck, with whom he was not in privity. In addition to the damages for the accident, the purchaser sought the money he had paid on the purchase price and compensation for profits lost in his business because he was unable to make normal use of the truck. The *Seely* court, expressing its concern that the realms of tort and contract law remain separate, denied relief under tort theories for these economic losses and indicated that the proper recovery was for breach of express warranty. 45 Cal.Rptr. at 20, 403 P.2d at 148.

In contrast, *Santor,* the progenitor of the minority view, permitted a purchaser, who was an ordinary consumer, to recover purely economic losses against the remote manufacturer of defective carpeting. The *Santor* court emphasized the importance of holding responsible an inadequate manufacturer who has put a worthless article in the hands of an innocent purchaser. It stated that the purpose of a strict liability action was to shift the risk of loss so that it is borne by "the makers of the products who put them in the channels of trade, rather than the injured or damaged persons who ordinarily are powerless to protect themselves." 207 A.2d at 312.

In *Spring Motors,* 489 A.2d at 660, the New Jersey Supreme Court revised its ruling in *Santor* inasmuch as it declined to allow a commercial party to recover economic losses under the theories of strict liability or negligence. Specifically preserving the viability of *Santor* in reaching its decision, the court again focused on the relative bargain-

---

6. In *East River,* there was no obstacle to this course of recovery because the parties were in privity.

ing power of the parties and the allocation of loss to the better risk-bearer in a modern marketing system. *Id.* at 670.

▉▉▉ Based on these decisions, this Court shares the concern of the *East River* and *Seely* courts that contract law not "drown in a sea of tort." *East River,* 476 U.S. at 866, 106 S.Ct. at 2300. However, it is equally cognizant of the difference in purchasers' abilities to protect themselves against the risk of loss engendered by a defective product. *Spring Motors,* 489 A.2d at 673. Moreover, the Court cannot help but notice that the three leading cases denying recovery for purely economic loss all involved purchasers who were commercial entities. While "[t]he considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power," *id.* at 670, the same cannot be said when the purchaser is an ordinary consumer.

Accordingly, this Court is persuaded that "[i]t is the corporations and not consumers which the Court had in mind when issuing the ruling in *East River.*" *Sherman v. Johnson & Towers Baltimore, Inc.,* 760 F.Supp. 499, 501 (D.Md.1990) (holding that buyers of a recreational yacht were in an ordinary consumer relationship vis-a-vis the manufacturer, rather than a commercial relationship, and thus could maintain an action in tort against the manufacturer for purely economic loss). This is particularly so when, as here, the damage alleged has aspects of both property damage and economic loss. *See id.* at 502; *cf. Karshan v. Mattituck Inlet Marina & Shipyard Inc.,* 785 F.Supp. 363 (E.D.N.Y.1992).

▉▉▉ Finally, the Court notes that a principal policy concern ordinarily weighing against recovery for economic loss under tort theories is absent in the instant matter. Generally, § 2–316 of the UCC allows sellers to exclude or limit their liability. Courts fear that application of tort principles in economic loss cases would contravene a specific legislative directive by depriving sellers of that ability. *See Spring Motors,* 489 A.2d at 670;

*East River,* 476 U.S. at 872–74, 106 S.Ct. at 2302–04. However, Vermont has amended its § 2–316 to provide that sellers cannot exclude or limit their liability in transactions involving ordinary consumers. Vt.Stat.Ann. tit. 9A § 2–316(5). Thus, in Vermont, permitting unlimited recovery for consumers under tort theories does not obviate legislative intent.

For these reasons, this Court predicts that the Vermont Supreme Court, if faced with similar facts, would allow tort recovery under the products liability theories of negligence and strict liability to ordinary consumers who suffer purely economic loss. Hence, Monsanto's Motion for Summary Judgment on Plaintiffs' claims of strict liability and negligence is denied.

### b. *Negligent Misrepresentation*

Plaintiffs allege that Monsanto made negligent misrepresentations concerning the suitability of its products for the control of crabgrass. Monsanto's argument that recovery for purely economic loss on a theory of negligent misrepresentation is barred was specifically rejected by this Court in *Vermont Plastics.*[7] 824 F.Supp. at 451.

▉▉▉ In defining the tort of negligent misrepresentation, Vermont has adopted the Restatement (Second) of Torts. *See Silva v. Stevens,* 156 Vt. 94, 108, 589 A.2d 852 (1991). It states:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts, § 552(1) (1977). When the claimant is seeking purely economic losses, there is a further limitation on liability. *Id.* § 552 cmt. a. Thus, liability is restricted to losses suffered:

---

7. This is the only argument advanced by Monsanto as to why the Court should deny Plaintiffs'

negligent misrepresentation claim.

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends.

*Id.* § 552(2).

 For a legal duty to arise under the Restatement, there must be 1) the requisite intent or knowledge by Monsanto, and 2) "justifiable reliance" by Plaintiffs. *Behn v. Northeast Appraisal Co., Inc.*, 145 Vt. 101, 105, 483 A.2d 604 (1984). At this stage of the proceedings, the Court finds that both criteria have been met.

 Here, the evidence indicates that Monsanto supplied label booklets as well as other information to Nutrite with the intent that farmers, such as Cobb, rely on it. For example, the label booklets in their instructions on proper application as well as their limitations on liability repeatedly refer to "all users" of Monsanto products. In fact, Monsanto specifically states, "[t]he normal use of the product, the product's label, and the directions for use all point to use of Monsanto's herbicides by a farmer, such as Plaintiffs...." Monsanto's Mem.Supp.Summ.J. at 5. (Paper # 48).

Moreover, Mr. Custeau described Cobb's problems to Ms. Butka of Monsanto, who recommended that a combination of Micro–Tech and Harness/Plus be used. The fact that Ms. Butka did not know that the information would be supplied specifically to Cobb is irrelevant. Rather, as the Restatement provides:

It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.

Restatement (Second) of Torts, § 552(2) cmt. h.

In allowing their fields to be sprayed with Monsanto's products for two years in a row, Plaintiffs clearly relied on this information, which was conveyed to them through Nutrite. Whether such reliance was justified is based on an objective standard, *Silva*, 156 Vt. at 108, 589 A.2d 852, and is better left to the province of the jury. Accordingly, Monsanto's Motion for Summary Judgment on the claim of negligent misrepresentation is denied.

2. *Breach of Warranties and the Privity Requirement*

 Plaintiffs are seeking recovery for breach of express and implied warranties under the UCC for the failure of Monsanto's products[8] to perform as promised. It is well-settled that privity, that is, a contractual relationship between the parties, is not required for recovery under breach of express or implied warranties when a person is injured as a result of a defective product. Section 2–318 of the UCC provides:

A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

Expounding on this provision, the commentary following it states, in relevant part:

This section expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser.

---

**8.** As a preliminary matter, this Court has a concern as to whether any claim about Harness/Plus as between Plaintiffs and Monsanto is within the purview of Article 2 of the UCC. Generally, Article 2 applies to "transactions in goods." Vt. Stat.Ann. tit. 9A § 2–102 (1966). Most courts agree that "transactions" mean sales. However, even defining "transactions" more broadly, the Article cannot properly be held to govern the exchange of goods for which no payment was given. Sonja A. Soehnel, Annotation, *What Constitutes a Transaction, a Contract for Sale, or a Sale within the Scope of UCC Article 2*, 45 A.L.R.4th 85 (1981). Thus, it would seem that the Article does not apply to Harness/Plus, as this product was a free gift. However, because this issue has not been raised by the parties, the Court need not address it at this time.

Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.

Vt.Stat.Ann. tit. 9A § 2–318, cmt. 3 (1966). Thus, the provision specifically leaves unanswered whether privity is necessary when loss, other than personal injury, has been suffered as in the case at bar.

However, in *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 572 A.2d 921 (1990), the Vermont Supreme Court dispensed with the need for actual privity in an express warranty case claiming economic loss.[9] The plaintiff, an ordinary consumer, had purchased a snowmobile made by Bombardier, from Race and Custom Sports Center, an authorized Bombardier distributor. The snowmobile came with an express limited warranty from Bombardier. The drive belt of the snowmobile malfunctioned within a week of purchase, and the plaintiff ultimately sought to revoke the snowmobile and to recover the purchase price.

The cause of action was brought under the Magnuson–Moss Warranty Act. Bombardier argued that revocation was not available against a remote manufacturer in the absence of privity. The Vermont Supreme Court disagreed and held that revocation is an appropriate remedy against a manufacturer whose product comes with an express warranty. Reviewing several cases from other jurisdictions, the court stated that "when a manufacturer expressly warrants its goods, it, in effect, creates a direct contract with the ultimate buyer." *Id.* at 613, 572 A.2d 921.

a. *Express Warranty*

Plaintiffs claim they are entitled to relief against Monsanto for breach of express warranty. Based on *Gochey,* the issue before the Court is whether Monsanto expressly warranted its product to Plaintiffs. Section 2–313 of the UCC describes the circum- stances under which an express warranty is created. It provides, in pertinent part:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

■ Monsanto argues that the only express warranty it made was that the herbicide would meet the chemical description on its label. This argument is simply not supported by the evidence. Rather, the label specifically provides "[t]his Company warrants that this product conforms to the chemical description on the label *and* is reasonably fit for the purposes set forth in the Complete Directions for Use Label Booklet." (emphasis added). The label booklet states that Micro–Tech controls crabgrass. Therefore, the statement on the label clearly falls within the purview of § 2–313(a) as an affirmation of fact made by the seller to the buyer relating to the quality of the goods.

■ Monsanto next contends that there is no evidence that Plaintiffs relied on the label or label booklets, and thus, it cannot be held to any express warranties. This argument is particularly disingenuous given that "[t]he natural tendency of ... [Monsanto's] promise was to induce buyers to rely on it."[10] *Seely,* 45 Cal.Rptr. at 20, 403 P.2d at 148; *accord, Young & Cooper, Inc. v. Vestring,* 214 Kan. 311, 521 P.2d 281, 289 (1974). Moreover, the comment to § 2–313 states, "[i]n actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance

**9.** Vermont has also abandoned the privity requirement in property damage cases. *See Vermont Plastics,* 824 F.Supp. at 453.

**10.** As noted *supra* at 1105, Monsanto expected the ultimate consumer to rely on its label booklets.

on such statements need by shown in order to weave them into the fabric of the agreement." Vt.Stat.Ann. tit. 9A § 2–313, cmt. 3. Accordingly, Monsanto's argument is not compelling.

■■■ Because Plaintiffs are ordinary consumers under § 2–316 of the UCC,[11] the language in Monsanto's label booklets purporting to limit recovery for breach of an express warranty is invalid. Section 2–316(4) states "[r]emedies for breach of warranty can be limited in accordance with the provisions of this article on liquidation or limitation of damages and on contractual modification of remedy (§§ 2–718 and 2–719)." However, this provision is limited by the next paragraph, which provides that "[t]he provisions of subdivisions (2), (3) and (4) ... shall not apply to sales of new or unused consumer goods or services."

■■■ Relying on *Corey v. Furgat Tractor & Equipment, Inc.*, 147 Vt. 477, 520 A.2d 600 (1986), Monsanto argues that even if Plaintiffs are consumers, the herbicides are not consumer goods, and thus, it can limit Plaintiffs' remedies. The Court disagrees. In *Corey*, the Vermont Supreme Court indicated that the meaning of "consumer goods" was governed by the definition of consumer in § 2451a(a) of the Consumer Fraud Act. Under this analysis, the herbicides are consumer goods, and thus the limitation applies. Such an interpretation is buttressed by Mr. Rice's testimony on the amendment of § 2451a(a):

> It was our feeling that necessarily—if that language was left in place [i.e. that goods were defined as "not for commercial, industrial or agricultural use"]—items which were purchased for agricultural use, even though they were purchased by an individual who is defined as being a consumer,

would not be subject to the law, and the farmer could not use his consumer status, if you will.

Rice Testimony at 23. For these reasons, Monsanto's Motion for Summary Judgment is denied on the breach of express warranty claim.

### b. *Implied Warranties*

■■■ Plaintiffs allege that Monsanto has violated the implied warranties of merchantability and fitness for a particular purpose. In reliance on *Gochey* and *Vermont Plastics*, they contend that the Vermont Supreme Court would abandon the privity requirement in implied warranty cases when the complainant is an ordinary consumer.[12] However, as this Court noted in *Vermont Plastics*:

> The opinion in *Gochey*, holding that a consumer may recover under an express warranty from the manufacturer even when there is no privity, does not support an expansion of the holding to an implied warranty case. This is so because in *Gochey* the court dispensed with the privity requirement because the manufacturer expressly warranted its goods to the consumer and in effect created "a direct contract with the ultimate buyer." (citation omitted). Indeed, such language could be read to indicate that the court was concerned that some relationship akin to contractual privity be present between the buyer and manufacturer for the buyer to recover economic damages. Expanding *Gochey's* holding to govern implied warranty cases would be a treacherous jurisprudential exercise.

824 F.Supp. at 453, n. 11.

On appeal, the Second Circuit accepted this interpretation of *Gochey*. Limiting *Go-*

---

11. This section, discussed *supra* at 1102, clearly indicates that farmers are consumers. Whereas this section was only persuasive authority for that proposition in the earlier context, it is binding authority here.

12. The Court notes that the existence of an agency relationship between a remote manufacturer and the immediate seller may also suffice to overcome lack of privity in breach of warranty claims under some circumstances. *See Costa v.*

*Volkswagen of America*, 150 Vt. 213, 551 A.2d 1196 (1988), *overruled on other grounds, Gochey*, 153 Vt. at 613, 572 A.2d 921. Although not briefed by Plaintiffs, a question as to whether Nutrite was acting as Monsanto's agent was raised at oral argument. While it appears that Nutrite was Monsanto's agent for the limited purpose of receiving notice, there is no evidence that the agency relationship extended beyond that so as to replace the need for privity in the instant matter.

*chey* to actions brought under the Magnuson–Moss Warranty Act, it stated:

> Indeed, as the district court correctly noted, the language in *Gochey*, that "when a manufacturer expressly warrants its goods, it, in effect, creates a direct contract with the ultimate buyer," suggests that the court remained concerned with maintaining some relationship in the context of a consumer purchase analogous to contractual privity between the manufacturer and consumer in order for the consumer to recover economic damages.

*Vermont Plastics,* 79 F.3d at 281.

A Vermont statute of limitations case likewise indicates a reluctance to dispense with the privity requirement. In *Kinney v. Goodyear Tire & Rubber Co.,* 134 Vt. 571, 367 A.2d 677 (1976), the plaintiff sought recovery against a remote tire manufacturer. To avoid dismissal on statute of limitations grounds, the plaintiff attempted to characterize the action as one sounding in contract. The Vermont Supreme Court rejected this attempt and noted that warranty law is not controlling when there is no contractual relationship between the plaintiff and the defendants. 134 Vt. at 576, 367 A.2d 677; *see also, Aube v. O'Brien,* 140 Vt. 1, 4, 433 A.2d 298 (1981) (in holding that the plaintiff's cause of action was the classic type of transaction contemplated by the UCC, the court noted that there was privity of contract between the parties).

Despite this case law, Plaintiffs urge the Court to interpret § 2–316(5) of the UCC,[13] enacted in 1972, as dispensing with the privity requirement. As noted above, this section prohibits sellers of consumer goods from limiting remedies for warranty claims. Plaintiffs concede that there is no language in the section which expressly abandons the privity requirement. Nevertheless, Plaintiffs argue that the purpose of the section was to extend special protection to consumers, and thus, it can be inferred that the legislative intent was to dispense with privity in transactions involving ordinary consumers.

The Court is not persuaded by this argument. According to principles of statutory construction, the legislature, in enactment of a statute, is presumed not to have intended to overturn long established principles of law unless such intention clearly appears by express declaration or unmistakable implication. *Gould v. Parker,* 114 Vt. 186, 190, 42 A.2d 416 (1945). No such express declaration or implication with regard to privity can be derived from the text of § 2–316(5). Moreover, as recently as 1988, the Vermont Supreme Court noted that the Vermont version of the UCC, unlike that of Massachusetts, has not eliminated the privity requirement beyond that expressed in § 2–318. *Costa v. Volkswagen of America,* 150 Vt. 213, 215, n. 1, 551 A.2d 1196 (1988), *overruled on other grounds, Gochey,* 153 Vt. at 613, 572 A.2d 921.

While recognizing that "a growing number of courts now allow non-privity plaintiffs to recover for ... economic loss," White & Summers, *supra* § 11–5 at 537, this Court feels constrained to hold that the Vermont Supreme Court would not abandon the privity requirement under the circumstances of the case at bar. Although in 1994 Ms. Butka visited the farms owned by Plaintiffs to inspect the alleged overgrowth of crabgrass, this contact does not create a relationship "analogous to contractual privity." *Cf. Gochey,* 153 Vt. at 608, 572 A.2d 921 (the manufacturer, who was the remote seller, made repeated attempts to repair the defect). Thus, Monsanto's Motion for Summary Judgment on Plaintiffs' claims of breach of the implied warranties of merchantability and fitness for a particular purpose is granted.

#### c. *Affirmative Defenses*

Next, Monsanto argues that Plaintiffs cannot recover under contract theories because they did not give adequate notice of the defect in accordance with § 2–714 and pursuant to § 2–607 of the UCC. Conceding that Nutrite was its agent for purposes of receiving notice, Monsanto asserts that Plaintiffs' notice to Nutrite was nonetheless inadequate in substance as well as timeliness.

According to comment 4 of § 2–607, "[t]he content of the notification need merely be sufficient to let the seller know

---

**13.** See *supra* at 1102 for the full text of this section.

that the transaction is still troublesome and must be watched." Both years Cobb notified Nutrite sometime in July that he was experiencing serious problems with crabgrass infestation. Expressing more than a mere "present dissatisfaction" with Monsanto's product, Plaintiffs' notice satisfies the standard enunciated in § 2–607. *Agway, Inc. v. Teitscheid,* 144 Vt. 76, 79, 472 A.2d 1250 (1984). Furthermore, Monsanto's allegation of untimeliness presents a question for the trier of fact. *Id.* at 80, 472 A.2d 1250. Thus, Monsanto's claim for denial of relief under breach of warranty theories for failure to provide notice is denied.

Monsanto also maintains that Plaintiffs should be denied recovery because they have not produced sufficient evidence to warrant consideration of their claim for damages. They further contend that Plaintiffs' loss was not foreseeable and that Plaintiffs have failed to mitigate their damages. The Court finds these arguments unpersuasive. Therefore, Monsanto's motion with respect to these claims is denied.

■■■■■ In calculating damages for a lower crop yield, "[t]he question always is whether such similarity has been established between the crops sought to be compared that proof of the yield of the undamaged crop has a logical tendency ... to indicate the probable yield of the [damaged] crop...." *W.R. Grace & Company v. LaMunion,* 245 S.C. 1, 138 S.E.2d 337, 341 (1964). Cobb took weighted samples of his silage corn in 1993 and 1994. In 1993, he found that his yield per acre was substantially lower than it had been in 1992. The following year Cobb noted a marked difference in yield between acres with good weed control and those with poor weed control. *See Raynor Bros. v. American Cyanimid Co.,* 695 F.2d 382, 385 (9th Cir.1982) (comparing yields from different acres in the same year provides an adequate gauge for determining loss). A comparison of these samples has a "logical tendency" to show the yield Cobb would have had both years if his fields had not been plagued by crabgrass.

■■■■■ Monsanto next argues that Plaintiffs' loss was a result of multiple causes and thus was not foreseeable. Clearly there are numerous factors which can influence a crop yield, including planting dates, fertilization, seed variety, cultivation and weather. However, a defendant may be liable for a plaintiff's injury even though there were other contributing factors. 5 Arthur Corbin, Corbin on Contracts § 999 (1964). Moreover, foreseeability requires only that the injury that in fact occurred "may reasonably be supposed to have been within the contemplation of both parties when the contract was made." *Id.* § 1011. In the instant matter, a reasonable person could conclude that it was foreseeable that Micro–Tech's failure to control crabgrass, as promised, could lead to a reduced crop yield.

■■■■■ Finally, Monsanto claims that Plaintiffs failed to mitigate their damages. While there is a general duty to mitigate damages, the burden of showing that such mitigation could have been accomplished is on the party asserting it. *Cartin v. Continental Homes of New Hampshire,* 134 Vt. 362, 367, 360 A.2d 96 (1976). Although Monsanto submits expert testimony suggesting that if Cobb had checked his fields earlier, he could have mitigated his damages by respraying or using a cultivator, *see* Def.'s Ex. 9, Baird Dep. at 2–3, there is "[n]o showing of the measure of the dimunition [sic], if any, of the loss ... by way of a concrete evidentiary offer...." *Lectro Management, Inc. v. Freeman, Everett & Co., Inc.,* 137 Vt. 113, 114, 400 A.2d 986 (1979). Accordingly, Monsanto has not met its burden.

### CONCLUSION

For the reasons set forth above, Monsanto's Motion for Summary Judgment is hereby GRANTED in PART and DENIED in PART. The motion is GRANTED on Plaintiffs' claims of breach of implied warranties for merchantability and fitness for a particular purpose. The motion is DENIED with respect to Plaintiffs' claims of strict liability, negligence, negligent misrepresentation and breach of express warranty.